UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------X

UNITED STATES OF AMERICA,                          20-CR-0481 (JMA)

      - against

DOUGLAS ROTH,

            Defendant.

----------------------------------------------------------X

**SENTENCING MEMORANDUM ON BEHALF OF DOUGLAS ROTH
(REDACTED PUBLIC VERSION FILED APRIL 30, 2021)**

Kenneth M. Abell
David M. Eskew
Julia H. Sear
ABELL ESKEW LANDAU LLP
256 Fifth Avenue, 5th Floor
New York, NY 10001
Telephone: (646) 970-7341
Facsimile: (646) 970-7345
E-mail: kabell@aellaw.com

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ....................................................................................................................1

THE SENTENCING GUIDELINES ........................................................................................4

   A.  Downward departures from the guidelines are appropriate here. .......................................4

      1.  Doug's conduct qualifies as aberrant behavior.............................................................4

      2.  Doug is an essential caretaker for his daughter and granddaughter. ..........................6

CONSIDERATION OF THE 3553(a) FACTORS COUNSELS LENIENCY.............................7

   A.  Extraordinary family circumstances...............................................................................8

   B.  Doug's health problems...................................................................................................9

   C.  A sentence of probation is sufficient to satisfy the 18 U.S.C. 3553 sentencing factors....11

      1.  The nature and circumstances of the offense and the history and characteristics of the defendant ....................................................................................................11

      2.  The need for just punishment, deterrence, societal protection, and rehabilitation ....16

CONCLUSION.....................................................................................................................19

## **TABLE OF AUTHORITIES**

**Cases**

*Gall v. United States* 552 U.S. 38 (2007)...................................................................4

*United States v. Alba*, 933 F.2d 1117 (2d Cir. 1991)...................................................7

*United States v. Almenas*, 553 F.3d 27 (1st Cir. 2009) ............................................10

*United States v. Butler*, 264 F.R.D. 37 (E.D.N.Y. 2010) ...........................................8

*United States v.Crosby*, 397 F.3d 103 (2d Cir. 2005)................................................4

*United States v. Deutsch*, 104 F. App'x 202 (2d Cir. 2004)........................................7

*United States v. Fernandez*, 443 F.3d 19 (2d Cir. 2006)............................................4

*United States v. Gorodetsky*, 288 F.R.D. 248 (E.D.N.Y. 2013) .................................8

*United States v. Hodges*, No. 07 Cr. 706, 2009 WL 366231 (E.D.N.Y. Feb. 12, 2009) .............17

*United States v. Jones*, 460 F.3d 191 (2d Cir. 2006) ..................................................8

*United States v. Lehmann*, 513 F.3d 805 (8th Cir. 2008)............................................8

*United States v. Martin*, 520 F.3d 87 (1st Cir. 2008).................................................8

*United States v. Martinez*, 207 F.3d 133 (2d Cir. 2000) .............................................5

*United States v. McClatchey*, 316 F.3d 1122 (10th Cir. 2003)....................................6

*United States v. Patterson*, 281 F. Supp. 2d 626 (E.D.N.Y. 2003)..............................6

*United States v. Rioux*, 97 F.3d 648 (2d Cir. 1996)..................................................10

*United States v. Schulman,* 16-CR-442 (JMA).......................................................6, 16

*United States v. Thavaraja*, 740 F.3d 253 (2d Cir. 2014) ...........................................7

*United States v. Tomko*, 562 F.3d 558 (3d Cir. 2009)...............................................18

**Statutes**

18 U.S.C. § 3553.................................................................................................passim

USSG § 5H1.4 .........................................................................................................9

USSG § 5H1.6 .........................................................................................................6

USSG § 5K2.20 ....................................................................................................4, 5

## **INTRODUCTION**

Douglas Roth is an honorable man who has led an exemplary life.  His achievements have been built upon the foundations of hard work, sacrifice, and an unwavering devotion to his family. Throughout his 64 years, he has always respected the law and been on the right side of it.  In April 2018, he made a single decision that has dramatically altered his life and was completely inconsistent with his integrity and good character.  He comes before the Court as a profoundly humbled and remorseful man.

After spending seventeen years as the Chief Financial Officer (CFO) of a publicly-traded company on Long Island, Doug made the decision to retire in October of 2017.  He agreed to stay on for a brief period to give the company time to find his replacement and transition his role.  By early 2018, the company had largely relocated its operations, including the senior management team, from Long Island to New Jersey and hired a CFO to replace him.  Throughout this time, Doug's role had become marginalized and diminished.  On March 31, 2018, Doug officially retired from the company.  And on April 4, 2018, Doug suffered a lapse of judgment that will haunt him for the rest of his life.  While in the possession of material information that was not yet public, Doug sold a portion of his stock in the company.

Specifically, at the time of the trade, Doug knew that the company's new CFO was negotiating a waiver to certain covenants in the company's credit agreement – which the company later obtained but which was not public as of April 4, 2018.   In doing so, Doug avoided a loss of $147,802.64, which he would have incurred if he had sold the stock when the information became public two weeks later.[1]  As set forth in the Presentence Investigation Report (PSR), Doug's sale of stock "did not harm the company or the stock market as a whole."  *See* ¶12.   While not

---

[1] There were several other pieces of negative information in the company's 8-K (released on April 18, 2018) that undoubtedly caused the stock price to fall but which Doug did not know about when he sold his stock on April 4.

minimizing his conduct in any way, this isolated trade is the full extent of Doug's transgression that brings him before the Court.

Consistent with his character, Doug accepted responsibility for his actions in a truthful and transparent manner.  Unlike many other sentencing proceedings, there are no disputes here about the guidelines range, the loss amount, or any other factor relating to Doug's conduct.  To say that Doug's conduct is an aberration from an otherwise law-abiding and exemplary life is an understatement.  The numerous supporting letters submitted in connection with this memorandum speak to the admirable life Doug has led and to the person he is.  The letters consistently describe a man who always put and continues to put family first – whether it has been supporting the passions of his own children, Chris and Corinne, or serving as a surrogate father to his niece and nephew who were abandoned by his stepbrother, or caring for family members during times of illness or personal strife.  Doug has also been continually devoted to his wife, Melissa.  They have been married for 35 years and driven to "break the cycle" of their own difficult childhoods to provide a better quality of life for their own children.

The letters also make clear that Doug has worked incredibly hard over the course of his life – beginning with delivering Newsday papers in grade school and continuing through a successful professional career of 40 years – to better himself and provide for his family.  The letters demonstrate that Doug has always seen it as his ultimate calling to be there for those who need him, whether it be his own family, his friends, or his co-workers.

More specifically, the letters explain how Doug has recently guided his family through what has been the most difficult period of their lives.  In the early fall of 2019, he and Melissa were thrilled to learn that their daughter Corinne was pregnant with their first grandchild.  In February of 2020, however, Corinne was diagnosed with severe preeclampsia and rushed into an

emergency C-section.  Doug's granddaughter, Mackenzie, was delivered at 30 weeks developed, weighing only 2lb 5oz, and was sent away from her mother to the NICU of a neighboring hospital. With his daughter and new granddaughter separated from one another, Doug visited the baby daily and shuttled breastmilk between hospitals when his daughter was too sick to care for her new baby.

Only five months later, Doug's ████████████████████████, and Doug became an essential part of her care and recovery.  He drove Corinne to her doctors' appointments and cared for his granddaughter Mackenzie while ██████████████████ ██████████████ Fortunately, ████████████████████████ in July 2020, but Doug's role in their lives has only increased during this harrowing time.  Among other things, Doug and Melissa continue to care for Mackenzie as his daughter slowly returns to work.  In connection with their caretaking duties, they have strictly quarantined throughout COVID.  The doctors now describe ████████████████████████████ ████████████████████████

Amid all these issues, Doug experienced his own health scare. In December of 2019, he was diagnosed with prostate cancer.  His diagnosis has added stress and uncertainty to their lives, but Doug has never allowed himself to wallow in self-pity or anger; to the contrary, the supporting letters show that, throughout these painful episodes, Doug has remained the "family's rock" and has been an unwaveringly strong source of support for all of them.

Since accepting responsibility for his actions, Doug has lost his reputation – among other things, his plan of seeking post-retirement work as a Board member or CFO consultant is no longer possible – and personally suffered tremendous hardship.  The public does not need protection from Doug – he is a remorseful, respectful man who is now focused solely on caring for his family.  His background, age, and the aberrant nature of his offense are assurances that Doug will not commit

3

future crimes.  A sentence of probation, along with his felony conviction, the payment of forfeiture he has already made, public humiliation, and the professional hardship Doug has endured since pleading guilty, is sufficient to provide a just punishment for Doug while still deterring others from the same criminal conduct. 18 U.S.C. § 3553(a)(2).

## II.   THE SENTENCING GUIDELINES

To determine the defendant's sentence, the Court must follow a three-step process. *See Gall v. United States* 552 U.S. 38, 49 (2007) (The district court should begin all sentencing proceedings by correctly calculating the applicable guideline range.).  The Court must (1) calculate the applicable Guidelines range, (2) determine the applicability of any relevant departures under the Guidelines, and (3) then consider all factors set forth in 18 U.S.C. § 3553(a) to establish whether a variance is warranted.  *United States v. Fernandez*, 443 F.3d 19, 26 (2d Cir. 2006); *United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005).  The Guidelines calculation in the Plea Agreement is 13 and, in the Addendum to the PSR, the Probation Department arrived at the same number.  (PSR Addendum ¶ 25.)  The Guidelines calculation consists of a base offense level (8) plus the applicable loss amount (8) minus full credit for acceptance of responsibility (3).  The U.S. Attorney's Office and Probation both agree that no enhancements are appropriate.

We respectfully submit that there are at least two departures that should apply in this matter.

### A.   Downward departures from the guidelines are appropriate here.

#### 1.   Doug's conduct qualifies as aberrant behavior.

Section 5K2.20 of the U.S. Sentencing Commission Guidelines allows for a downward departure "if the defendant committed a single criminal occurrence or single criminal transaction that (1) was committed without significant planning; (2) was of limited duration; and (3) represents a marked deviation by the defendant from an otherwise law-abiding life." *See* U.S. SENTENCING

COMM'N, *Guidelines Manual*, (Nov. 2018) [hereinafter *USSG*] §5K2.20.

The Court may consider the defendant's (1) mental and emotional conditions; (2) employment record; (3) record of prior good works; (4) motivation for committing the offense; and (5) efforts to mitigate the effects of the offense. *See USSG* § 5K2.20, comment. (n.3). While USSG § 5K2.20 provides for many instances in which the Court cannot apply a departure, such as if the case involved serious bodily injury or the use of a dangerous weapon, none of the limiting factors apply in the instant case. *See USSG* § 5K2.20(c).

Here, Doug Roth's circumstances fit squarely within the applicable factors for this departure. At the time of the offense, Doug Roth was a 61-year-old, hard-working professional devoted to supporting his family. *See infra* Section III. He has no criminal record. Until 2018, Doug had continually received material non-public information for decades during his successful career as a financial officer and never acted on the information. Doug's actions on April 4, 2018, while inexcusable, "represent[] a marked deviation by the defendant from an otherwise law-abiding life." *USSG* §5K2.20(b). *See United States v. Martinez*, 207 F.3d 133, 137 (2d Cir. 2000) (finding single acts of aberrant behavior should be assessed in the context of the defendant's day-to-day life….") (citations omitted). Moreover, his actions were not the product of significant planning and were of limited duration. Upon his retirement, Doug was advised by his financial advisor that he should diversify his portfolio. That was the impetus behind Doug's sale of stock on April 4, 2018. This is not to minimize Doug's conduct – he should not have sold the shares when he did – but his actions were of limited duration and not the product of significant planning.

In addition, as set forth in Section III, Doug's circle of family and friends recounted many "good works" Doug has done over the years, including caring for his stepbrother's children, always being there for his extended family and friends, and supporting his family through harrowing

health crises, including his own cancer diagnosis. Doug's health, employment history, and substantiated record of prior good works all support the application of a downward departure in his sentencing for aberrant behavior. *See United States v. Schulman,* 16-CR-442 (JMA) (in a similar case, this Court found this departure warranted because there was no evidence to suggest planning, the defendant's criminal conduct was limited to a single conversation without any evidence of ongoing involvement in illegal trading, and the behavior at issue qualified as a marked deviation from defendant's otherwise law-abiding life.); *see also United States v. Patterson*, 281 F. Supp. 2d 626, 628 (E.D.N.Y. 2003) (approving aberrant conduct departure where the criminal act was spontaneous and involved no planning in defendant's otherwise law-abiding life); *United States v. McClatchey*, 316 F.3d 1122, 1130 (10th Cir. 2003) ("The district court granted McClatchey a 3–level downward departure from the Guideline range on three grounds: (1) extraordinary family circumstances, (2) aberrant behavior, and (3) a combination of the two factors.)

## 2.   Doug is an essential caretaker for his daughter and granddaughter.

In addition, section 5H1.6 allows for a downward departure due to meaningful family ties and responsibilities. In evaluating the applicability of this departure, courts consider the following non-exhaustive list of circumstances: (i) the seriousness of the offense; (ii) the involvement in the offense, if any, of members of the defendant's family; and (iii) the danger, if any, to members of the defendant's family as a result of the offense. A departure under 5H1.6, also requires presence of the following circumstances:

> (i) The defendant's service of a sentence within the applicable guideline range will cause a substantial, direct, and specific loss of essential caretaking, or essential financial support, to the defendant's family.

(ii) The loss of caretaking or financial support substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant….

(iii) The loss of caretaking or financial support is one for which no effective remedial or ameliorative programs reasonably are available, making the defendant's caretaking or financial support irreplaceable to the defendant's family.

(iv) The departure effectively will address the loss of caretaking or financial support.

In Doug's case, his critical role as a caretaker for his grand-daughter Mackenzie and his continuing role in guiding his family through the trauma of the past year warrants a downward departure for the four above-stated reasons. Presently, Doug cares for his granddaughter while his daughter works 3-4 days a week. Daycare is not an option for Mackenzie due to her more fragile health and the pandemic. While his wife Melissa also assists with childcare responsibilities during the week, the entire Roth family relies on Doug's daily support as they juggle work responsibilities and caring for Mackenzie. *See infra* Section III.

The Roths are a "close-knit family whose stability depends on [Doug's] continued presence." *United States v. Alba*, 933 F.2d 1117, 1122 (2d Cir. 1991) (affirming the sentencing court's finding that "incarceration in accordance with the Guidelines might well result in the destruction of an otherwise strong family unit."); *see also United States v. Thavaraja*, 740 F.3d 253, 262 (2d Cir. 2014) (affirming sentencing court's finding that the defendant's family circumstance under 5H1.6, along with other factors, warranted a downward departure); *United States v. Deutsch*, 104 F. App'x 202, 204 (2d Cir. 2004) (finding departure justified where none of defendant's relatives were capable of caring for his family for any extended period of time).

## III.   CONSIDERATION OF THE 3553(a) FACTORS COUNSELS LENIENCY

The Court shall consider variances outside the applicable guideline range based upon the statutory sentencing factors found at 18 U.S.C. §3553(a). The Court may impose a sentence that

is "sufficient, but not greater than necessary" to serve the goals of sentencing.  18 U.S.C. §3553(a).

"Although the sentencing judge is obliged to consider all of the sentencing factors outlined in

section 3553(a), the judge is not prohibited from including in that consideration the judge's own

sense of what is a fair and just sentence under all the circumstances." *United States v. Jones*, 460

F.3d 191, 195 (2d Cir. 2006).

## A.   Extraordinary family circumstances

In addition to the "family ties and responsibilities" downward departure available to the

Court, courts have varied from the guidelines based on a defendant's family circumstance.  While

the focus of 5H1.6 is family responsibilities, the cases in which courts have granted a variance for

family circumstances are varied and broader than the corresponding downward departure.  *See e.g.*

*United States v. Martin*, 520 F.3d 87, 93 (1st Cir. 2008) (affirming a 91-month variance down from

the guideline range based in part on "the support that the defendant stood to receive from his family

[and] personal qualities indicating his potential for rehabilitation;" post-*Booker*, "policy

statements normally are not decisive as to what may constitute a permissible ground for a variant

sentence in a given case."); *United States v. Lehmann*, 513 F.3d 805, 809 (8th Cir. 2008) (affirming

a downward variance to probation where the district court found that a prison sentence would

negatively affect the defendant's disabled young son); *United States v. Gorodetsky*, 288 F.R.D.

248, 249 (E.D.N.Y. 2013) (imposing a lower than guidelines sentence for two defendants who

pleaded guilty to tax evasion, in part due to the emotional and financial support they each provided

to their families.)  The desirability of defendant's presence at home among his family members is

also a consideration.  *United States v. Butler*, 264 F.R.D. 37, 38 (E.D.N.Y. 2010) (imposing a

lower sentence in part due to the defendant's "young child and loving wife suggest a desirability

of the defendant's early presence at home," along with his "strong supportive network of extended family…").

While Doug has endured the stress associated with pleading guilty to a crime, he has remained a strong support system and caretaker for members of his family.  In her letter, Doug's wife Melissa explained how she continues to rely on her husband for support, stating, "[i]n spite of it all, Doug's strength and commitment has never waivered and he is the one who continues to help us all through it. There's never self-pity or anger, just a positive attitude and the belief that we, as a family, can get through anything together."[2]

Notably, Doug's daughter Corinne explained Doug remains a key caretaker for her daughter, Mackenzie.  She explained:

> As my daughter is a preemie, and was on a breathing machine called a CPAP after birth, I was explicitly advised by the neonatologists to limit her exposure to germs as she is considered high risk with regards to Covid.  My parents watch my daughter 3-4 days per week, as daycare is not an option due to the pandemic, and I do not know what I would do without their support. This year he has gone above and beyond both for me and for my family.[3]

The pivotal and essential role Doug maintains in assisting his family through his █████████ ████████████████████████ and granddaughter's daily needs, Doug's case warrants a below guideline sentence based on his continued devotion to support his family.

### B.     Doug's health problems

In addition, while Doug's diagnosis of prostate cancer may not rise to the level of warranting a downward departure under 5H1.4, it can and should be considered under 3553(a) as a factor warranting a variance from the Guidelines range. As set forth in Doug's letter, his most

---

[2] Letter of Melissa Roth, Exhibit A.
[3] Letter of Corinne Morgenstern, Exhibit B.

recent Gleason score in connection with his prostate cancer is 6, and his most recent PSA is a 19.8. His doctor remains puzzled by the fact that his PSA is as high as it is, and while the course of treatment is still being determined, it seems likely that Doug will need to undergo some form of treatment in the coming months or years. *See, e.g., United States v. Rioux*, 97 F.3d 648, 654 (2d Cir. 1996) (affirming that the district court did not abuse its discretion when it "differed significantly from the heartland of guideline cases" and imposed a lower than guideline sentence in part because of the defendant's medical condition.); *United States v. Almenas*, 553 F.3d 27, 37 (1st Cir. 2009) (affirming downward variance of 43 months below the bottom of the guideline range based on defendant's combination of physical and mental disabilities).

Relatedly, Doug's high risk of exposure to COVID-19 if incarcerated presents another compelling reason for the court to impose a non-guideline sentencing in his case. Doug's cancer diagnosis places him in a high-risk category that renders him particularly vulnerable to the risks associate with contracting COVID-19, in addition to his age (64). His prostate cancer means he is more likely to become severely ill from COVID-19.[4] Although Doug is vaccinated, his health is still at risk if incarcerated. First, the vaccine is not one hundred percent effective against contracting COVID-19; it merely helps reduce one's chances of becoming seriously ill.[5] Second, while the proliferation of the vaccine across the country, and importantly in federal prisons, is a helpful public health development, the CDC is still uncertain about the longer-term benefits of the vaccine.[6] In Doug's case, if he is incarcerated with cancer and not protected against new variants of COVID-19 or the effectiveness of his vaccine declines over time, his health will be in jeopardy.

---

[4] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html
[5] https://www.health.harvard.edu/blog/fully-vaccinated-against-covid-19-so-what-can-you-safely-do-2021032522230
[6] https://www.cdc.gov/coronavirus/2019-ncov/vaccines/keythingstoknow html

Doug's precarious health amidst the backdrop of the COVID-19 pandemic alone warrants a non-guideline sentence to protect his safety.  Notably, last year the former Attorney General William Barr utilized the expanded powers set forth in the coronavirus relief bill to direct the Bureau of Prisons ("BOP") to move non-violent, at-risk inmates who pose minimal likelihood of recidivism to home confinement.[7]  A non-incarceratory sentence for Doug would fit squarely within the government's priorities to help prevent certain eligible, non-violent offenders like Doug from contracting COVID-19.

### C.    A sentence of probation is sufficient to satisfy the 18 U.S.C. 3553 sentencing factors.

#### 1.    The nature and circumstances of the offense and the history and characteristics of the defendant

Under 18 U.S.C. § 3553(a)(1), the Court should consider "the nature and circumstances of the offense and the history and characteristics of the defendant."  In this case, Doug's actions in 2018, as described above, were not consistent with the law-abiding life he had lived up until that time.  Doug repeatedly received MNPI in his long and successful career without ever trading on it.  He has always been a devoted and supportive husband, father, friend, and surrogate father to his niece and nephew.  He is an essential caregiver to his granddaughter.

In their letters to the Court, Doug's wife, children, and several friends described his notable character.  Doug's wife Melissa described Doug as a devoted husband and father, explaining, "Doug is an amazing husband, father and friend. You can lean on him and he'll always hold steady. As I've said, he's our glue and our rock.  He's the center of our family and my world."[8]  Along the same lines, many of Doug's family members and close friends have observed his unwavering

---

[7] https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement.pdf and
https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement_april3.pdf
[8] Letter of Melissa Roth, Exhibit A.

commitment to his family over the years.   Doug's son Chris explained, "My dad has committed his life to being the best husband and father he can ever be and he led by example. He did his best to provide his family with opportunities and experiences that he and my mom were never given as children . . . I understand my father made a bad decision but this was an aberration and was completely out of character for him. "[9]

Doug's brother, also named Chris, wrote, "I know him to be a loving husband to Melissa and father to his two outstanding children; daughter Corinne and son Chris. Doug is always there for his kids. Throughout their lives, whether it was soccer or lacrosse or basketball, Doug supported them in whatever they pursued."[10]

The letters submitted by Doug's family and friends demonstrate that in addition to devoting his time and energy to his wife and children, Doug has always been a dedicated friend and family member to his extended family.   Many family members and friends recounted Doug's selfless efforts to financially and emotionally support his niece and nephew after his stepbrother abandoned his family.

Doug's wife Melissa wrote:

> Doug's actions throughout his life are representative of who he really is. His younger step brother . . . was married and divorced twice.  His second wife was left thousands of dollars in debt, with two children to raise on her own . . . Even though his brother's actions had nothing to do with Doug, he felt that he wanted to do what he could to help his niece and nephew and their mom . . . He would provide support for clothes and sports equipment when their mother was struggling financially . . . he began to set aside money towards the kid's education. We took the kids out for their birthdays every year and saw them numerous times throughout the year. . . They spend Christmas Eve with us every year. Doug is totally committed to them.[11]

---

[9] Letter of Christopher Roth (son), Exhibit C.
[10] Letter of Christopher Roth (brother), Exhibit D.
[11] Letter of Melissa Roth, Exhibit A.

Doug's sister-in-law Christine wrote:

> I have been divorced from [Doug's] brother Clifford for over 15 years. Since the divorce Doug continues to be a strong presence in my children's lives . . . When their father chose not to maintain a consistent relationship with his own children, Doug stepped in and was a constant in their lives . . . Doug also believes that family is everything . . . [My son] stated that Doug was more of a father to me than my own dad.[12]

Doug's brother and sister-in-law, Gary and Peggy Lanza, wrote:

> During the 90's, we had become guardians for our two nephews when they were still in grammer (*sic*) school. Doug treated these boys just as if they were our own children and helped to make them feel a true part of the family. Additionally, we know that Doug has acted as a surrogate father to his brother's children due to his absence. These are just a few examples of the man that we know Doug is – a kind, honest, compassionate, generous and loving individual who has impacted many people in a positive way.[13]

Doug's former co-worker Rich Hoda wrote:

> In the years that I have known Doug he has always treated others with respect and honesty. In the time I worked for Doug he exhibited those traits as well as being supportive to his staff and co-workers. At a time while working for Doug I was going through a difficult divorce and he showed his trustworthiness keeping it confined to only those who needed to know. His support during that difficult time also allowed me to handle my job and family responsibilities.[14]

Doug's friend Randy Seider wrote:

> As we have had 49 years together I could literally write a book about Doug. He is well respected from neighbors, friend and colleagues. He is the kind of friend you would always want in your life. He has always been there for me in the good times and bad times.[15]

In their letters to the Court, family members and friends reflected on Doug's work ethic and integrity.  In fact, Doug himself wrote that he worries his lapse in judgment will cause his

---

[12] Letter of Christine Carney, Exhibit E.
[13] Letter of Gary and Peggy Lanza, Exhibit F.
[14] Letter of Rich Hoda, Exhibit K.
[15] Letter of Randy Seider, Exhibit G.

community to disregard his decades of hard work and assume Doug "cheated" his whole life – when in fact he made one bad decision in 64 years. He explained, "I started as a staff accountant and worked my way to the CFO of a public company. Again, my career is a source of personal accomplishment and pride."[16]  Doug's friend Michael Langella wrote, "During these years at Aceto Mr. Roth continued to be a hard-working, conscientious, and dedicated professional. Moreover, he has always been both personally and professionally a respectful dignified person with a high degree of moral standards and integrity."[17]  His friend Gary Carusi explained, "Doug is undoubtedly of the highest moral character, dedicated, ethical, disciplined, and a hard-working professional and committed family man."[18]  Doug's son Chris recalled how Doug "woke up at 5:30 every morning to go to the gym before heading to work. Many nights he did not arrive home until 7:30 PM. He had a very strong work ethic and never complained about the long hours or demands of the job. It was important to him to provide for his family."[19]

Perhaps most emblematic of Doug's good character is the way in which Doug shepherded his family through his daughter's pregnancy complications, the birth of his premature granddaughter, and ███████████████ diagnosis and treatment with a calm support and strength – all while facing the uncertainty of this pending action and his own prostate cancer diagnosis.

Doug's son Chris described his father's role during this harrowing time for his family:



> I can't stress to you enough how important a role my dad plays in our family. Since this legal challenge started, ████████████ ███████████████████ my niece was prematurely delivered due to severe preeclampsia ███████████████ ████████████████████ The stress of being in the hospital at the time of my sisters' emergency C-section

---

[16] Letter of Douglas Roth, Exhibit H.
[17] Letter of Michael Langella, Exhibit I.
[18] Letter of Gary Carusi, Exhibit J.
[19] Letter of Christopher Roth (son), Exhibit C.

and seeing my 2lbs 5oz niece being transported to the NICU was very traumatic for me. Shortly after her birth, ███████████ ███████ My dad has also been diagnosed with cancer. All within the backdrop of COVID-19. Needless to say, this has been a horrific year for our family.[20]

His daughter Corinne described how important and meaningful her dad's love and support has been to her in the past couple years:

> My daughter was born at 30 weeks gestation weighing just 2 pounds, 5 ounces. She spent 36 longs days in the Neonatal Intensive Care Unit (NICU). I was hospitalized on and off for a week's time following her birth and I did not get to meet my daughter until she was 4 days old. My father and my mother would drive to Huntington Hospital to visit me daily. My father would then transport breastmilk to Northshore University Hospital and visit his amazing and tiny little granddaughter, Mackenzie Ann. He was there to love on my little girl when I was too sick to even meet her.
>
> ███████████████████████████████████████████
>
> I regularly went into Manhattan to meet with specialists for diagnostic and then pre-operative appointments as it was determined that I needed ███████████████████ My husband had used up his time off while our daughter and I were hospitalized, so my father volunteered to drive me to and from the city while my mom watched my daughter. As it was during Covid, he was not allowed into the buildings, much less the appointments. My father would wait outside of the buildings for hours at a time while I met with specialists . . . I will forever be grateful for his support during such a mentally and physically exhausting time.[21]

Lastly, a notable trait of Doug's is his modesty.  Consistent with the person described in all the supporting letters, Doug has not led a flashy or ostentatious lifestyle.  Despite rising to the level of CFO of a publicly traded company, he has lived in the same house for close to 30 years, which the PSR described as being in an upper-middle class residential neighborhood.  Doug and Melissa utilize their daughter's old bedroom to babysit for their granddaughter.  Doug is also now retired, so he and his family are living off their savings and have a negative monthly cash flow.

---

[20] Letter of Christopher Roth (son), Exhibit C.
[21] Letter of Corinne Morgenstern, Exhibit B.

His plan of seeking post retirement work as a Board member or CFO consultant is no longer possible.

In *United States v. Schulman*, Your Honor sentenced Robert Schulman, a defendant convicted of insider trading with a significantly higher Guidelines range than Doug's, to a noncustodial sentence of three years' probation. During the sentencing hearing, Your Honor explained that in addition to considering the relevant sentencing guidelines, you would "sentence here the old-fashioned way, by focusing on the defendant and his conduct." *See* 16-CR-442 (JMA); Docket Entry 155. Here, we ask Your Honor to apply the same "old-fashioned approach" and straightforward sentencing philosophy to Doug, whose circumstances and character merit a below guideline sentence.

### 2.    The need for just punishment, deterrence, societal protection, and rehabilitation

18 U.S.C. § 3553(a)(2) sets forth that the Court should consider the need for the sentence imposed to: (A) reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense and (B) afford adequate deterrence to criminal conduct.[22]

This case and the resulting felony conviction that flowed from it have cast a shadow over Doug's life, all while he has managed three family health crises during a global pandemic. Doug has endured substantial collateral punishments, including but not limited to financial punishment in the form of a $147,802.64 forfeiture judgment that he has already paid, degradation of his professional and personal reputation, his inability to find work as an employee, a consultant, or board member in his field and the understanding that his actions have created shame and distress

---

[22] The other two purposes of § 3553(a)(2) are not of concern here. Doug has no criminal history and is not a threat to society. He is educated, self-sufficient, does not abuse alcohol or illicit substances, and is well established with a stable family that he has always supported; he is not in need of training or rehabilitation services provided by the Bureau of Prisons to inmates.

for his family.  He is also a defendant in a pending civil action by the SEC relating to the same conduct (which is also before Your Honor but currently stayed) and, along with several other corporate officers from his former company, is named as a defendant in a securities class action that was dismissed by Judge Korman but is now before the Second Circuit.  These other cases have understandably caused additional stress, anxiety and financial insecurity.  In her letter to the court, Doug's wife shared that "all of these challenges have had an adverse effect on our mental health and well-being."[23]  Doug has worked to maintain his mental health during these hardships through seeking solace and comfort in his tight-knit family life.

Before the instant case, Doug Roth had never engaged in criminal conduct.  As indicated in the many letters submitted by family and friends, Doug has always been a law-abiding professional who provided for his family through hard work.  The likelihood of recidivism in this case is non-existent given Doug's age (64), his retirement, inability to work in his field, and his attendant lack of access to confidential information.  *See, e.g., United States v. Hodges*, No. 07 Cr. 706, 2009 WL 366231, at *8 (E.D.N.Y. Feb. 12, 2009) (sentencing 43-year old defendant to non-Guideline sentence and noting that the Guidelines "do not take into account the inverse relationship between age and recidivism.")

As for deterrence, the public nature of Doug's arrest and plea allowed similarly situated professionals to become aware of the serious consequences for financial advisors who trade on MNPI.  After his arrest, Doug's case was public on the internet and published in his community paper and Newsday – the very paper he used to deliver around his neighborhood in grade school.  In his letter, Doug describes how the public humiliation of his plea was devastating.[24]  Even a non-custodial sentence for Doug will send a strong message to the white-collar community that his

---

[23] Letter of Melissa Roth, Exhibit A.
[24] Letter of Douglas Roth, Exhibit H.

behavior is inexcusable. See § 3553(a)(2)(B); *see also United States v. Tomko*, 562 F.3d 558, 575 (3d Cir. 2009) (district court considered general deterrence and did not abuse its discretion by imposing sentence of probation; instead, it engaged in "precisely the type of individualized assessment" required by Supreme Court precedent.)

Finally, 18 USC § 3553(a)(6) provides that sentences should reflect "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]"  Here, respectfully, Doug Roth's circumstances present at least as compelling of a case for probation than did those of Robert Schulman, who Your Honor sentenced to probation for insider trading.  Among other things, Doug promptly pled guilty and accepted responsibility for his actions whereas Mr. Schulman was convicted post-trial. Doug was also recently diagnosed with cancer and is being sentenced in the midst of the COVID-19 pandemic; these factors were not present in Schulman's case.  Further, Schulman was not an integral caregiver to his immediate family like Doug has been and continues to be.  And finally, the PSR in Schulman's case concluded that the Guidelines offense level applicable was 22 and the government took the position that a 2-level enhancement for obstruction of justice should apply. Here, all parties agree that the applicable guidelines offense level – before departures that the Court may apply – is a much lower 13. Accordingly, to account for the need to avoid unwarranted sentence disparities, pursuant to 18 USC § 3553(a)(6), a probationary sentence for Doug Roth is appropriate in this case.

This conviction will forever stain Doug and his family. Doug is eager to receive correctional treatment for his mistakes while still providing essential support to his loved ones. Considering the tremendous trauma Doug has endured these last few years, he can receive adequate justice without a custodial sentence and without additional monetary penalties.

## <u>CONCLUSION</u>

In recognition of all the foregoing – including the life he has led, the needs of his family, and nature of his offense – Douglas Roth asks for compassion and mercy in the imposition of his sentence.  We respectfully request that the Court impose a sentence of probation.

Respectfully submitted,

ABELL ESKEW LANDAU LLP

By: *Kenneth M. Abell*

Kenneth M. Abell
David M. Eskew
Julia H. Sear
256 Fifth Avenue, 5th Floor
New York, NY 10001